BENJAMIN B. MUSSEY *vs.* THE BULFINCH STREET SOCIETY.

The Central Universalist Society, in Boston, was incorporated January 21st, 1823,
with all the powers, privileges, and immunities, belonging to other religious
societies, by law, and with power to purchase, hold, and dispose of any estate, real
or personal, the annual income of which should not exceed a certain sum, for the
purposes of its incorporation : The corporation, having erected a meeting-house,
caused the pews therein to be appraised and assessed by a committee duly
appointed and authorized for the purpose, and to be offered for sale at public
auction, at the appraisal: The pews were all sold, accordingly, May 12th, 1823,
and deeds thereof, prepared by the committee, in pursuance of its authority, were
given by the corporation to the purchasers : The terms of the deeds were, that the
pews should remain the property of the purchaser, so long as he should pay such
sums, as should from time to time be assessed thereon by a legal vote of the
society, for the support of the minister, repairs of the house, and other necessary
expenses ; but that if he should neglect to pay the assessments for one year, the
pew should revert to the corporation, which was authorized and empowered
to sell the same, and, after deducting what might be due to it with incidental
charges, to pay the residue to such purchaser: The corporation, May 20th, 1823,
adopted certain by-laws, by which, the mode of assessing and collecting the taxes,
and the proceedings on the forfeiture and sale of pews, were regulated and pre
scribed, and which provided for the appointment of a standing committee, whose
duty it was made, among other things, " to compute the expenses of the society
and assess them on the pews according to their appraisal : " No appraisal and
assessment were ever made subsequently to the first, but the taxes were notified
by the treasurer, and paid quarterly by the members, upon the basis of the original
appraisal and assessment, with occasional temporary additions to the amount, and
a permanent one of ten per cent in 1833, but with no change in the proportions :
There was no record of any computation of the expenses, or assessment of the
taxes, until July, 1841, when the expenses were computed by the standing com-
mittee, and the amount directed to be ratably levied and assessed, on the pews,
according to the assessment and appraisal of 1823 : But it appeared by the records,
that, since the year 1835, accounts of the taxes received quarterly, and of the
expenditures incurred, had been annually rendered by the treasurer to the stand-
ing committee and proprietors, and had been approved by both, and that the
doings of the standing committee, for the same time, had been uniformly ap-
proved by the society: On the 17th of April, 1838, an act was passed by the legis-
lature, at the request of the society, changing its name to the Bulfinch Street
Society, which was accepted by the corporation ; and, in October of the same year,
a minister of the Unitarian denomination was settled over it: The plaintiff

purchased a pew of one of the original proprietors, on the 29th of January, 1839, and two others March 13th, 1840, and, in pursuance of a transfer indorsed on the original deeds, received new deeds thereof from the corporation, in the name of the Bulfinch Street Society: The plaintiff having refused to pay the taxes assessed on his pews subsequently to February, 1840, measures were taken by the society for the sale of his pews, as forfeited, according to the terms of the deeds ; and the plaintiff, thereupon, to prevent such sale, paid the sum demanded, under protest. In an action brought to recover the sum thus paid, it was held :

1. That, as no mode of taxation was prescribed by the act of incorporation, the society had a right to adopt any mode, which was not prohibited by law; and, consequently, with the assent of all the proprietors, might tax the pews in its meeting-house, and regulate the proceedings therefor, by its by-laws.

2. That the proprietors of pews (who alone were members of the society) had a right to consent to the taxation of their pews, by receiving deeds expressly au thorizing the levy and assessment of taxes thereon.

3. That, under the power to purchase, hold, and dispose of property, the corporation might let or sell the pews in its meeting-house, on the condition, that the lessee or grantee should pay a certain sum yearly, or such taxes as should be lawfully assessed thereon.

4. That one who purchased a pew, and thereby became a member of the corporation, subsequent to the change of name, and received a deed from the society under its new name, was thereby estopped from calling in question the validity of the pro ceedings with reference to the change of name.

5. That the taxes might be laid on the pews, according to the original appraisal and assessment of 1823, with such alterations therein, permanent or temporary, as might from time to time be made by the corporation.

6. That the approval of the treasurer's accounts, and of the doings of the standing committee, with reference to the taxes and expenditures, was equivalent to a computation of the expenses, as required by the by-laws.

7. That the provisions of the Rev. Sts. c. 20, §§ 7 and 30, do not extend to and regu late the proceedings of those religious societies, which have the right to tax pews, whether expressly conferred by law, or acquired by the consent of the proprietors ; and, consequently, that such societies may regulate, by their by-laws, the mode of assessment and taxation.

8. That, on the forfeiture of a pew, for the non-payment of the taxes due thereon, for a year, according to the condition in the deeds, the corporation had a right to deduct and retain from the proceeds all the taxes then due, as well those which had been due less as those which had been due more than a year.

THIS was an action of assumpsit, to recover the sum of one hundred and twenty-eight dollars, paid by the plaintiff to the defendants, under protest, and in order to prevent certain pews, belonging to him, in the defendants' meeting-house, from being sold for the payment of taxes. The writ was dated September 3d, 1842, and contained the common money counts. The cause was tried in the court of common pleas, at the January term, 1843, before *Williams*, C. J., who, being of opinion on the whole evidence, that the action could not be maintained, directed a nonsuit. The plaintiff thereupon

13 *

filed exceptions to this order, and to certain rulings of the court, in the course of the trial, excluding evidence offered by him, and admitting evidence against his objections.

From the report of the evidence, as contained in the bill of exceptions, the following facts appeared.

The legislature, by an act approved January 21st, 1823, incorporated (§ 1) certain persons named therein, fifty-five in number, together with all others who might associate with them, and their successors, as a religious society, by the name of the Central Universalist Society, in the city of Boston, with all the privileges, powers, and immunities, to which other religious societies in this commonwealth were entitled by law ; and with express authority (§ 2) to purchase, hold, and dispose of any estate, real or personal, for the use of the society, provided the income thereof should not exceed, at any time, the value of four thousand dollars.

On the 28th of April, 1823, — the society having been previously organized under the act of incorporation, — a meeting of the corporation was held, at which a committee was appointed to appraise the pews in the new meeting-house belonging to the society in Bulfinch Street, and to assess the same ; to cause the pews to be offered for sale, at a proper time, and to sell them, but not for a price less than the sums at which they were severally appraised; and to prepare suitable deeds of the pews to be given to purchasers. The committee proceeded accordingly, and appraised the pews, and fixed the proportions, to be paid by the several proprietors, of all taxes to be levied thereon, for defraying the expenses of the society. In this appraisal, the amount of tax to be assessed upon each pew was not fixed at any regular proportion of the value of each as compared with others ; pews valued at four hundred and twenty dollars being taxed twenty-four dollars, and pews valued at one hundred dollars, one hundred and twenty-five dollars, one hundred and forty dollars, one hundred and fifty dollars, one hundred and sixty-five dollars, being all taxed at ten dollars each. The pews were subsequently advertised for sale ; and, on the 12th of May, 1823,

were put up and sold at auction, under the direction of the committee, and deeds thereof prepared by the committee were given to the purchasers.

The deeds were signed by the treasurer, by order and in behalf of the society, attested by the signature of the clerk, and were in the following form:

Know all men by these presents: That for and in consideration of four 'undred and twenty dollars, paid by S. C., of Boston, in the county of Suffolk, to the Central Universalist Society in Boston, for pew No. 66, in the Central Universalist Meeting-house, in Boston aforesaid, said C. is hereby declared and acknowledged to be the sole, true, lawful, and legal owner of said pew No. 66, which pew is to remain the property of the said C. his heirs and assigns, so long as he or they shall pay or cause to be paid such sum or sums of money as shall from time to time be assessed thereon, by a legal vote of said society, for the support of the minister, repairs of the house, and other necessary expenses.

And, if said C., his heirs or assigns, should fail of paying, or causing to be paid, the said assessments, for one year, then said pew shall revert back to the society, who are hereby authorized and empowered to sell said pew No. 66, and after deducting what may be due to said society and incidental charges, shall pay the overplus to said C., or his legal heirs and assigns.

And if said C. should at any time intend to transfer said pew, No. 66, he shall first offer it to the society; and whenever said pew is transferred, the taxes due thereon shall be paid to the end of the quarter in which the transfer is made.

The appraisal and assessment were not recorded in the society's records at the time they were made; but the defendants produced a certificate, recorded therein June 20th, 1841, signed by nine persons describing themselves as the surviving members of the committee, which contained a copy of such appraisal and assessment; and it was agreed, for the purposes of the trial, that the persons, whose names were subscribed to the certificate, would testify to the facts above stated, relative to the making of the appraisal and assessment; that a report was made by the committee in accordance therewith; and that the appraisal and assessment so made had ever since been observed and acted upon by the society.

On the 18th of May, 1823, certain by-laws were adopted oy the corporation.

By the third article of these by-laws, the standing commit-tee of the society was required, among other things, "to examine and approve all accounts against the society, before authorizing the treasurer to pay them ; and to compute the ex-penses of the society, and assess them on the pews according to their appraisal." The treasurer, by the fourth article, was required "to give special notice to delinquent proprietors three months previous to their pews being forfeited; to note to the committee all pews which should become forfeited ; to cause notice to be given of their sale, by posting a printed or written notification thereof upon the doors of the meeting-house, and placing one in each pew in the house, at least fourteen days previous to the sale thereof; and to employ a licensed auctioneer to make the sale." By the ninth article, the taxes were required to be paid quarterly ; and, if not paid at the expiration of the fourth quarter, it was declared, that the pew, or pews, should become forfeited to the society for their payment, and should then be sold at public auction, and the surplus of the sale, after deducting the moneys due to the society, should be paid over by the treasurer to the former owner thereof.

In the year 1838, the subject of a change of the corporate name of the society was brought forward at a quarterly meet-ing, regularly notified and held on Sunday afternoon the 18th of February, at which a motion was made in writing, for the appointment of a committee of three, to consider the pro-priety of applying to the legislature for an alteration of the act of incorporation, "so as 'to conform to the sentiments of the society and the name of the church." After discussion, the subject was referred to the standing committee, who, at their next regular meeting, came to a vote thereupon, "that it be recommended to the proprietors, that it is expedient to change the name, but would leave it with them to designate."

A meeting of the society being called and held for the purpose, the committee made a report of the vote above men-tioned; and a discussion thereupon ensued, at the close of which the report was accepted, by a vote entered on the

records as nineteen to eleven. It was then voted, that an application be made to the legislature, to change the name of the society to that of the Bulfinch Street Society, and that the clerk prepare and present a petition for that purpose.

The clerk, in pursuance of these votes, prepared a petition, and caused it to be presented to the legislature, in the name and on the behalf of the society, setting forth that the members were desirous that their corporate name should be changed as above mentioned, for the reason, that the term " Universalist," as then theologically defined, expressed a meaning inconsistent with their principles of faith. On this petition being presented, seventeen members of the society signed a memorial or remonstrance, which was presented to the legislature, praying that the name might not be changed, as they knew of no benefit that could arise to the society therefrom; and expressing their belief, that if the change should take place, a division would be created in the society, which they desired to prevent. The legislature, notwithstanding, passed an act, April 17th, 1838, authorizing the society to take the name of the Bulfinch Street Society, whenever, at a legal meeting called for the purpose, it should so elect.

At a meeting of the society held on the 22d of April, 1838, the clerk reported, that, agreeably to the instructions received by him at the meeting of March 18th, he had made application to the legislature, in behalf of the society, for a change of its corporate name, and that the legislature had granted the request and had passed an act accordingly, as already mentioned. The report was accepted.

A meeting of the society being called and held for the purpose of acting upon the result of the application for the change of name, the clerk was directed to read such parts of the records as had reference to the subject of the meeting, together with a copy of the petition for the change of name, and the act passed by the legislature for that purpose ; which having been done, it was then voted, that the question of the acceptance of the act be taken by yeas and nays on written

ballots; and the question was thereupon so taken, and decided in the affirmative, eighteen yeas and fourteen nays.

On the 20th of May, 1838, the by-laws of 1823 were revised and amended, among other particulars, as in the following new draft of the fourth article :

Article 4th.   The treasurer shall also be the collector of the society, and shall keep a just account of all the receipts and expenditures thereof, and of all the debts and credits of each member of it, to be open for the inspection of any member of the society, and make a report thereon at the annual meeting.

He shall collect and receive all moneys due to the society, and give special notice to delinquent proprietors, three months before their pews become forfeited.

He shall note to the committee all pews that have become forfeited, and shall cause notice of their sale to be given according to law : namely, he shall post up a notification of the intended sale thereof, at the principal outer door of such church or house, at least three weeks before the time of the sale, therein setting forth the number of the pew, if any, the name of the owner or occupant, if known, and the amount of the tax due thereon; and if said tax or any part thereof shall remain unpaid at the time appointed for such sale, the treasurer shall sell the pew, by public auction, to the highest bidder, and shall execute and deliver to the purchaser a sufficient deed of conveyance of the same ; and the money arising from said sale, beyond the taxes and reasonable incidental charges, shall be paid by the treasurer, to the former owner of the pew so sold, or to his (or her) assigns.

On the 25th of January, 1839, the plaintiff became a member of the society, then known as the Bulfinch Street Society, by purchasing a pew of one of the original purchasers at the sale in 1823, who had ever since been the owner thereof.   The transfer to the plaintiff was made by an indorsement, signed by the grantor, on the back of the original deed, in the following words : " In consideration of two hundred dollars, I hereby transfer and convey the within named pew to Benj. B. Mussey, January 25th, 1839.   S. C." On the same day, the plaintiff received, without objection, a deed of the pew from the society, in the form already mentioned (p. 151) except that the name of the Bulfinch Street Society was substituted therein for that of the Central Universalist Society.

In October, 1839, the Rev. Mr. Gray, a minister of the Unitarian denomination, was settled over the society.

On the 12th of February, 1840, the plaintiff first refused to pay the tax on his pew, having previously paid the tax thereon from the time of his purchase.

Or the 13th of March, 1840, the plaintiff purchased two more pews, and received deeds thereof from the society, without objection, in the form already described.

A special meeting was held on the 25th of October, 1841, in pursuance of an order of the standing committee, and after notice duly given by the clerk, at which certain alterations were made in the by-laws, and a preamble and vote were adopted, confirming the past acts and doings of the corporation, as recorded in the book of records, especially the proceedings relative to the change of name, and to the alterations of the by-laws.

The following are the material changes which were made in the by-laws, at this meeting :

The words " their appraisal," in the third article, relative to the assessment of taxes, were struck out, and, instead thereof the words " the original assessments made by the committee of the proprietors appointed at a meeting held April 28th, 1823, and which is recorded at page 441 of these records," were inserted. The notice to delinquent proprietors, as provided in the fourth article, was abrogated ; and, instead thereof, notice was required to be given to such proprietors, as provided in the ninth article, which was revised and amended, as follows :

Article 9th. The taxes shall be paid quarterly, and notice thereof shall be given by the treasurer, by a printed bill or notification left in each pew on the Sunday preceding or next after the day when the tax shall be payable ; and if the same shall not be paid within six months after such day, any pew upon which such tax shall remain so unpaid, shall thereby become forfeited, and notice thereof, signed by the treasurer, stating the amount of the taxes due, and of the intention of the treasurer to sell the same, unless they shall be paid with interest, and of the day and hour and place of sale, shall be served on the proprietor, by leaving a copy at his usual place of abode, or by depositing the same in the post office, directed to him at Boston, and in such pew, at least four weeks before the day fixed for such sale ; and if the taxes and interest shall continue unpaid, the treasurer shall proceed to make sale of such pew, as prescribed in the fourth article, unless otherwise directed by the standing committee.

Additional by-laws were also made, relating particularly to the form of the deeds to be given by the society on a transfer of pews. The new form contained a condition, that the grantee should pay all taxes, &c., lawfully assessed upon his pew, pursuant to the by-laws, and, that upon failure or neglect of payment, for the period of six months, the, pew should become forfeited and revert to the society, and be sold in the manner prescribed by the by-laws, for the payment of the taxes due thereon.

On the 26th of April, 1842, payment of taxes having been for some time refused by the plaintiff and several other proprietors, the standing committee directed the treasurer to notify the delinquents, that their pews were forfeited, and would be sold at auction, on the 7th of June then next, unless the taxes due thereon, with incidental expenses, should be previously paid. On the 27th of April, the treasurer gave the notices as directed, by sending one in a letter to each delinquent, through the post-office, by depositing them in the pews according to the by-laws of 1841, and by posting a notice three months on the outer door of the meeting-house. The notice consisted of a schedule of the pews, according to their numbers, with the names of the proprietors, and the amount of taxes due on each, and a statement of the time and place of sale.

On the 7th of June, 1842, a sale of the pews of delinquent proprietors took place, agreeably to notice, on the following conditions : " first, cash as soon as knocked down ; second, receipt to be given for the money, and deed as soon as it can be made out ; third, deed to be given in form adopted 25th of October, 1841." The plaintiff, who was present, protested against the sale of his pews, and paid the taxes thereon and expenses, declaring, at the same time, that he should bring an action to recover back the money so paid. He also purchased at the sale fourteen pews belonging to other delinquents, which were sold for taxes assessed in like manner, and for the like purposes, with those on his own pews, and

received deeds of the same from the society, without objection, in the form prescribed by the by-laws of 1841.

It appeared, by the testimony of the treasurer, that all the taxes since 1835 had been notified and paid quarterly upon the basis of the original appraisal and assessment made in 1823, with an addition of ten per cent which had been made in 1833, and had been since continued, and with occasional temporary additions to the amount, prior to the year 1833, but with no change in the proportions ; and it was admitted by the plaintiff, that all the taxes prior to 1835 had been collected in like manner, and upon the same original appraisal and assessment, with the addition of the ten per cent in 1833. It appeared by the records, that accounts of the taxes received quarterly, and of the expenditures incurred, had been yearly rendered by the treasurer to the standing committee and proprietors, since the year 1835, which accounts had also been annually approved by the committee and the proprietors ; that the doings of the standing committee, for the same time, had been uniformly approved at the quarterly meetings of the proprietors, down to and including the 25th of April, 1841 ; that the proprietors, at their several annual meetings, had fixed the salary of their minister by vote ; and that no protest or objection against any proceeding had been made by the plaintiff, till the sale of his pews, except on the occasion of the settlement of Mr. Gray, in 1839, and the meeting of October 25th, 1841.

It did not appear, that any record had been made of a computation of the expenses, and of an assessment of taxes, during the years 1839 and 1840, or subsequently until July, 1841 ; when, at a meeting of the standing committee held on the 13th, it was voted, that a subcommittee be appointed to compute the expenses of the society, and to assess them on the pews, according to the appraisal. The subcommittee subsequently computed the expenses for the year 1841, and reported the same to the standing committee, who thereupon voted, that the sum so ascertained be ratably levied and

assessed on the pews, according to the assessment and appraisal of 1823.

No subsequent computation and assessment were made until July 12th, 1842, when a similar proceeding took place with reference to the expenses for the year ending May, 1843.

The plaintiff paid the taxes on his first purchased pew, from the 12th of February, 1839, to the 12th of February, 1840, without protest or objection. From the last mentioned date, he refused to pay the taxes on that pew, and those also assessed on the two others purchased by him March 13th, 1840, to the day of the sale, June 7th, 1842. The taxes, for payment of which the plaintiff's pews would then have been sold, if he had not paid the same, were due on one pew, ten quarters from February 12th, 1840, to May 12th, 1842, and eight quarters on each of the other pews from August 12th, 1840, to May 12th, 1842. The sum paid by the plaintiff included the taxes, interest, and expenses.

The plaintiff, in the course of the trial, proposed to introduce evidence to show, that the taxes assessed since the fall of 1839, for the recovery of which the suit was brought, were raised and in part appropriated to pay the salary of the Rev. Mr. Gray, a minister of the Unitarian denomination, who was settled over the society in October, 1839; that the settlement of Mr. Gray was illegal and void; and that the taxes had consequently been raised for an illegal purpose. But the court ruled, that the validity of Mr. Gray's settlement could not be tried in this action.

The defendants offered to prove, that the records of March 18th, 1838, had been altered without authority, and that the vote on the acceptance of the report of the standing committee, respecting a change of name, was, in fact, nineteen to one, and was originally so recorded, and that the number of the votes in the negative had been altered from one to eleven. But the court ruled, that evidence to contradict the record in this particular, was inadmissible.

The cause was argued at a former term, by *B. Rand,*
*C. H. Warren & A. H. Fiske,* for the plaintiff, and by
*C. G. Loring & W. Dehon,* for the defendants.

WILDE, J.  This case has been elaborately argued by
counsel, and numerous questions have been referred to the
consideration of the court, some of which are not free from
difficulty, and have required time for deliberation.

The action is assumpsit, to recover money alleged to have
been paid by the plaintiff under protest, and by compulsion,
to prevent his pews from being sold, for the non-payment of
taxes thereon assessed.

The general question is, whether these taxes were legally
assessed.  The plaintiff's counsel contend, that they were
not, either in pursuance of any statute provision, or the by-
laws of the defendant society.  On the other hand, the
defendants contend, that they were fully authorized to levy
these taxes on the pews in their meeting-house, and that
they were legally assessed, in conformity with the by-laws of
the society.  In January, 1823, the defendants were incor-
porated as a religious society in the city of Boston, with all
the powers, privileges, and immunities to which other reli-
gious societies in this commonwealth are entitled by law.
The society, being duly organized, proceeded, at a proprietors'
meeting, to appoint a committee to appraise the pews in the
meeting-house and assess the same ; to cause all the pews to
be offered for sale ; but to sell no pew under the appraisal.
This was accordingly done, and a report thereof was made by
the committee to the proprietors.

Every pew in the meeting-house was appraised, and the
proportion to be paid by the proprietor thereof, of all taxes to
be levied for defraying the expenses of the society, was duly
fixed and assessed.  And afterwards deeds were given in the
following form.  [Here the judge repeated the language of
the deed on page 151.]

It appeared, at the trial, that all taxes from and after 1823
had been uniformly levied and paid, upon the basis of the
original appraisal and assessment, without any new appraisal

or change of assessment, excepting occasional additions, in particular cases, and one regular addition of ten per cent since 1833, all which were voted by the proprietors.

In 1839, the plaintiff purchased his pews, and received his deeds in the usual form, containing a condition which the plaintiff was to perform, or the pews, according to the express terms of the deed, would revert to the society, unless the condition was illegal.   The plaintiff's counsel contend, that the condition was illegal and void, on the ground that the society had no right, by their charter, to assess any tax in this form.   The charter did not prescribe the mode of taxation and assessment, and the society had the right to prescribe any mode not prohibited by law.   We do not think this depends upon any custom of the religious corporations of the city of Boston, to levy taxes in this manner ; for, unquestionably, the pew-holders had a right to consent to such taxation ; and they all did consent, by receiving deeds expressly authorizing the taxes to defray the expenses of the society, to be assessed and levied upon their several pews.   By the charter, the society were empowered to purchase, hold, and dispose of any estate, real or personal, for their use, provided the annual income thereof should not exceed, at any time, the value of four thousand dollars.   The society, therefore, had as good a right to convey the pews on condition of the payment of taxes, as they had to lease them for a certain rent.

But it was argued, that by the *St.* of 1786, *c.* 10, §§ 1, 2, taxes for the support of a minister, for building and repairing the house of public worship, and for sacred music, might be raised by any town, district, parish, precinct, or other body politic and religious society, in any legal meeting, which taxes are to be assessed upon all the ratable polls and property, within each particular corporation or society.   But this statute does not prohibit the assessment of taxes on pews ; on the contrary, there is an express proviso " that nothing shall take from any society in Boston, or any other town, the right and liberty to support worship by a tax on pews, or other

established mode." And there is no statute which prescribes the particular mode in which taxes are to be assessed, and consequently such societies had the right to levy taxes in any reasonable manner they might see fit to adopt.

Another objection to the right of the defendants to impose the condition in the deeds to the plaintiff is, that the change of the name of the corporation was unauthorized, as it changed the fundamental constitution of the society, and was void. " If the change were valid," it is said, " the former society had no legal existence ; and if it were void, the latter had no legal existence." This objection has been elaborately argued, but it appears to the court to be entirely unfounded ; for, if the Bulfinch Street Society had no title, they could convey none to the plaintiff; and he has no other title. And, furthermore, as he has had possession of his pews, and his title has never been disturbed or questioned, he is estopped to deny the right of the society to make the conveyance. If he has no title to the pews, he certainly cannot maintain this action. If the plaintiff held his pews under conveyances from the society, before the change of the name of the corporation, he would have the right, no doubt, to question the regularity and validity of the proceedings of the society in this respect. Whether the objections urged in such case would avail, is a question which is not raised by the facts reported in this case. It was argued, for the plaintiff, that by taking an assignment from some of the original proprietors, he succeeded to their rights. But this argument cannot be maintained, for he voluntarily relinquished that title, and took a new title from the society, after the change of their name.

Another objection to the condition of the deeds is, that a corporation has no power to enforce a forfeiture, unless it is given by their charter. But, admitting this principle, it does not apply to the present case ; for all the proprietors of pews assented to the condition by receiving their deeds. It is a part of the contract between the parties; and, besides, the breach of the condition is not a forfeiture in the nature of a

14 *

penalty ; the title of the pews reverted to the society merely for the purpose of obtaining payment of the taxes thereon due ; and after a sale, the taxes were to be deducted from the avails of the sale, and the surplus was to be paid over to the plaintiff.

We are therefore clearly of opinion, that the society had the right to tax the pews; and this right, although not expressly given, is conferred by necessary implication.   By the charter, the corporation were to have and enjoy all the privileges, powers, and immunities, to which other religious societies in this commonwealth are entitled by law.

The fallacy of the argument for the plaintiff on this point is, that it proceeds on the assumption, that no tax on pews can be valid, unless the power to levy taxes in that mode is given by statute.   Whereas they have clearly the right to let or sell the pews, on the condition that the lessee or grantee shall pay a certain sum yearly, or to pay taxes if lawfully assessed.    There is no principle of law by which such a condition can be held void.   The act required to be done is neither *malum in se,* nor *malum prohibitum,* nor against the policy of the law.

The next question is, whether these taxes were lawfully assessed by a legal vote of the society, according to their by-laws.

The plaintiff's counsel contend that they were not for several reasons.

In the first place, it is objected that the taxes were assessed by the standing committee, and not by the corporation. This is a mere formal objection.   By the by-laws, article 3d, the standing committee are authorized to assess taxes on the pews according to their appraisal.   If this by-law is valid, then the taxes were assessed by a legal vote of the society. It appears by the report, that a committee of the society did appraise and assess the pews, as they were authorized to do, and did report their appraisal and assessment to the society, and that the society adopted the appraisal and assessment so made.   This was undoubtedly intended as a permanent

assessment on the pews, subject to such changes as might be afterwards made by the society. And so the taxes have been levied ever since; they have therefore been assessed according to the votes of the society. But it has been argued that annual assessments were required; and, from a literal construction of the language of the condition, such an inference might be made; but, considering all the proceedings of the society, and the facts reported, we think the true meaning is, that the taxes were to be laid on the pews according to the permanent assessment, or according to any alterations therein, which might from time to time be made by the society. Such was the construction adopted by the parties, and it was never questioned, until this controversy arose. Another objection is, that the committee did not compute the expenses of the society before assessing them, as they were required to do. The defendants' answer to this objection is, that "the society have yearly approved the accounts of the treasurer, showing the amounts of the taxes and the expenditures, and have quarterly approved the doings of the standing committee, whose duty it was to approve the expenditures before they were made, and to compute the expenses and assess them on the pews; and that this course of proceedings is equivalent to a legal vote on the subject, and is in the fullest sense a ratification of all that was done." This seems to us a satisfactory answer. Indeed, if the tax was made according to a just computation of the expenditures and expenses, it is immaterial when the computation was made.

Again, it is objected that these taxes were not laid solely "for the support of the minister, repairs of the house, and other necessary expenses," and that if any part of the taxes were laid for any other purpose, they would be illegal. This, no doubt, would be a valid objection, if the fact were proved; but there is no evidence to that effect, and the misapplication of the moneys raised by the taxes is not to be presumed.

Some other objections have been made to the proceedings of the committee, as not being conformable to the by-laws,

which do not require particular notice.   They do not affect, in our judgment, the validity of the taxes, and they have been satisfactorily answered by the defendants' counsel.

We are then brought to the consideration of the important question, whether these by-laws are valid.   The plaintiff's counsel insist that they are not; they being inconsistent with and repugnant to the provisions contained in the Rev. Sts. *c.* 20, with which provisions only the defendants were bound to comply.   And, unquestionably, if these by-laws are repugnant to the law of the land, they are utterly void, and the taxes were illegally assessed.   The question then is, whether the provisions of the Rev. Sts. *c.* 20 are to be so construed, as to extend to and regulate the proceedings of this and other religious societies, which have a right to assess taxes on the pews of the proprietors.   By § 7, it is enacted, that "the qualified voters of every parish and incorporated religious society, and of every religious society organized according to the provisions of this chapter, shall meet in the month of March or April annually, at such time and place as shall be appointed by their assessors, and shall choose a clerk, and two or more assessors, a treasurer, collector, who shall be sworn, and such other officers as they shall think necessary; all of whom shall continue in office for one year, and until others are chosen and qualified in their stead." And by § 30, it is provided, " that the assessors of every parish and religious society, in assessing taxes for the support of public worship and for other parish charges, shall assess the same upon all the property of all the members of such parish or society."

From these sections, it is inferred, that no tax can be legally assessed but by sworn assessors; but by reference to other sections in the act it is obvious, we think, that no such inference was intended.   For by §§ 31 and 32, it is expressly provided, that moneys for certain purposes may be assessed on pews.   We think, therefore, that §§ 7 and 30 had reference only to § 28, which provides " that the qualified voters of every parish or religious society may grant and vote such

sums of money as they shall judge necessary for the settlement, maintenance, and support of ministers or public teachers of religion; for the building or repairing of houses of public worship, and for all other parish charges; all which sums shall be assessed on the polls and estates of all the members of the parish or society, in the same manner and proportion as town taxes are assessed." But it was left optional with the parish or society to raise moneys for the purposes named, to be assessed on the polls and estates, or to assess the same on pews, if they elect and have a right so to do; and, in the latter case, §§ 7 and 30 are not applicable. This seems to have been the intention of the legislature, for it is expressly provided by §§ 31 and 32, that pews may be taxed for the *repairs* of any meeting-house, or other house of public worship, while by § 18 moneys raised for repairing meeting-houses are to be assessed on the polls or estates of all the members of the parish or religious society. By the plaintiff's construction these sections would be repugnant. So § 19 provides, that nothing contained in this chapter shall enlarge or diminish the powers of taxation, enjoyed by any parish or religious society, by virtue of any special law or act of incorporation.

There were then many such parishes and religious societies in the commonwealth; so that it was not intended, that all taxes should be assessed on the polls and estates, in the manner directed in the other sections. The second section is still more comprehensive. That provides, that " all parishes and religious societies, whether corporate or unincorporate, shall continue to have and enjoy their existing rights, privileges, and immunities, except so far as the same may be limited or modified by the provisions of this chapter, and the eleventh article of the amendments of the constitution." It is true, that the defendants' act of incorporation does not authorize them to assess taxes on pews, without the consent of the proprietors, as many other acts of incorporation do; nor do they claim any such right. But they had the right to tax pews with the consent of all the proprietors, as I think has been

abundantly shown, and this right they continued to have and enjoy. Neither by the Rev. Sts., nor by any former statute, is the taxation of pews prohibited ; on the contrary, it is provided by the *St.* of 1799, *c.* 87, § 5, that nothing in that act contained shall take from any church or religious society in the town of Boston, or any other town, the right and liberty to support the public worship of God by a tax on pews, or other established mode. And the same right and liberty are recognized in a provincial statute. But, without these statutes, the defendants had a right to assess taxes on pews with the assent of all the proprietors. This is not denied by the plaintiff's counsel. In their opening argument, they say, if the society had the authority to insert these conditions relative to taxation in their deeds, or if they received the assent of all the proprietors, it is supposed, that they will be mutually binding on the society and the proprietors ; if not, then the general law regarding the taxation of pews will be applicable ; and, unquestionably, so is the law. The defendants, being owners of their meeting-house, had the right of selling their pews on condition of the payment of a certain sum annually, or of an annual tax ; and to this condition all the proprietors of the pews assented, by purchasing and receiving conveyances of their pews. The condition does not differ, in principle, from the reservation of a rent charge on a feoffment or other conveyance in fee, or the reservation of rent on a lease ; and that such contracts are lawful contracts cannot, we think, admit of a reasonable doubt. This right of the defendants existed at the time of the Rev. Sts. ; and by § 2 of *c.* 20, before referred to, it is provided, that they shall enjoy their existing rights, privileges, and immunities, with certain exceptions, which do not apply to this case, when rightly construed. We are therefore of opinion, that the taxes were rightly assessed, according to the by-laws ; and that on the breach of the condition, the pews of the plaintiff reverted to the society, who were authorized to sell them according to their by-laws. It is objected, that some of the taxes required to be paid by the plaintiff, and which were paid, had

not been due and unpaid a year before the time of sale; and that the defendants had not the right to sell the pews for the payment of such taxes. The answer is, that, at the time of the advertisement of the pews for sale, some of the taxes thereon had been due for more than a year, and were unpaid, whereby the pews reverted to the society, and authorized a sale; and then, by the express terms of the deeds, the society were authorized to deduct what might be due to them with incidental charges; and this includes all taxes legally assessed, whether due for more than a year or not: otherwise, the society would have no security for the taxes which had not been due for a year before the time of sale.

With regard to the notice of sale, it may be well doubted, whether, if it were defective, the plaintiff could avail himself of any exception to it in support of this action. It does not appear, that he made any objection to the notice before he paid the taxes; if he had, the defendants might have given a new notice. His objection was, we presume, to the legality of the taxes, for that was the main question in dispute. His objection was to the sale on any notice; and if the plaintiff had not paid the taxes, the defendants might have concluded to take him at his word, and leave him to try his title to the pews by an action. The pews were the defendants' property, and if the plaintiff would not pay the taxes, and did not request a sale, they might continue to hold them, until they should be requested by the plaintiff to make a sale.

It is not, however, necessary to express an opinion on this point; for we can perceive no defect in the notice. It is conformable to the by-laws as altered in 1838, before the time when the plaintiff purchased his pews; and it is conformable also to the by-laws as afterwards altered in 1841.

In conclusion, taking into consideration all the questions and matters discussed by counsel, although some questions have not been particularly noticed, we are of opinion that this action cannot be maintained.

*Exceptions overruled.*